UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

ALEXIS PENNINGER and ANGELA BELL,

    Plaintiffs,

v.

OPTIMAL ELECTRIC VEHICLES, LLC,

    Defendant.

CAUSE NO. 3:24-CV-350 DRL-SJF

OPINION AND ORDER

Alexis Penninger and Angela Bell sue Optimal Electric Vehicles, LLC alleging violations under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, after Optimal terminated their employment. Optimal moves to dismiss their suit because they agreed to arbitrate it. The court grants the motion to compel arbitration and stays this action.

BACKGROUND

Ms. Penninger and Ms. Bell began working for Optimal on May 1, 2023 [6 ¶ 10]. When they were hired, they signed written contracts [14-1; 14-2] that contain an arbitration provision:

> Aside from the equitable enforcement of this contract, I agree that if a dispute arises concerning my employment with and/or termination by Company the exclusive method for resolving the dispute arising out of employment or in any way related to any alleged wrongful acts on the part of Company, its affiliates, directors, shareholders, agents, or employees ("Company Parties") relating to employment, including but not limited to … discrimination or other violation under Title VII of the Civil Rights Act of 1964 … shall be through the procedures and policies of the American Arbitration Association ("AAA") utilizing a single arbitrator, thereby waiving my right to adjudicate these claims in a judicial forum.

The contracts also identically address cost-sharing and fee-shifting: "Notwithstanding anything to the contrary in the AAA rules of Employment or otherwise, the cost for arbitration shall initially be split equally between me and the Company, provided however that the prevailing party in any dispute between the parties will be entitled to its costs and expenses including attorney[] fees, court or arbitration costs

and all other costs associated with such action" [14-1 at 2; 14-2 at 2]. Finally, the contracts contain a severability clause [14-1 at 2; 14-2 at 2]. The final page of each agreement reflects the dated signatures of Ms. Penninger and Ms. Bell [14-1 at 3; 14-2 at 3].

On September 8, 2023, Optimal terminated Ms. Penninger and Ms. Bell [6 ¶ 19]. Ms. Penninger filed suit on April 30, 2024 [1] and later amended her complaint to add Ms. Bell on July 15, 2024 [6]. Their Title VII suit alleges sex discrimination and wrongful termination after they complained to human resources [*id.* ¶ 18, 22-28]. Optimal requested voluntary dismissal in favor of arbitration given the signed contracts containing the arbitration agreements, but Ms. Penninger and Ms. Bell declined [14 at 1]. This motion ensued.

## DISCUSSION

The Federal Arbitration Act (FAA) treats written arbitration agreements as "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of a contract." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 629-30 (2009) (quoting 9 U.S.C. § 2). Congress enacted the FAA to "reverse the longstanding judicial hostility to arbitration agreements" that carried over into American courts from English common law. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991). The law strongly favors arbitration, *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), though arbitration remains a matter of contract, so courts must view arbitration agreements on equal terms with other contracts, *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).

"[T]he question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *See AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986); *see also Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 185-86 (2019). Under the FAA, three things are needed to compel arbitration: (1) a written arbitration agreement, (2) a dispute within the agreement's scope, and (3) a refusal to arbitrate that dispute. *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005). "Whether parties have a valid arbitration agreement at all" is a "gateway matter[]" to the question of arbitrability. *Herrington*

*v. Waterstone Mortg. Corp.*, 907 F.3d 502, 506 (7th Cir. 2018) (quoting *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 n.2 (2013)). The question of arbitrability—whether the parties must submit a particular dispute to arbitration—is "an issue for judicial determination . . . [u]nless the parties clearly and unmistakably provide otherwise[.]" *AT&T*, 475 U.S. at 649.

The party asserting the existence of a valid and enforceable contract to arbitrate, and seeking to enforce an arbitration agreement, bears the burden. *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1063 (7th Cir. 2018). Although the FAA does not provide an evidentiary standard under which to consider an objection to arbitration, courts "have analogized the standard to that required of a party opposing summary judgment . . . [namely, that] the opposing party must demonstrate that a genuine issue of material fact warranting a trial exists." *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002). "An agreement to arbitrate is treated like any other contract," so the court looks to the "state law that governs the formation of contracts to determine if there was a valid agreement." *Baumann v. Finish Line, Inc.*, 421 F. Appx. 632, 634 (7th Cir. 2011) (citing *Tinder*, 305 F.3d at 733). "The basic requirements for a contract are offer, acceptance, consideration, and a meeting of the minds of the contracting parties." *Conwell v. Gray Loon Outdoor Mktg. Grp., Inc.*, 906 N.E.2d 805, 812-13 (Ind. 2009).

Ms. Penninger and Ms. Bell aren't disputing the existence of their arbitration agreements or that their claims fall within their scope. They say these agreements should not be enforced. Specifically, they argue that (1) their arbitration agreements were unconscionable when they were signed, (2) they are financially precluded from arbitrating their claims because of the expense, (3) the fee-shifting provisions in both of their contracts are unenforceable, and (4) the shortened limitations periods in their contracts are unenforceable. The court must address the first two arguments because these bear on the enforceability or validity of their arbitration provisions, *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 71 (2010) (question of unconscionability for the court when it bears on validity), whereas the third argument is for the arbitrator, and the last is moot.

A. *Unconscionability of Arbitration Agreements.*

First, Ms. Penninger and Ms. Bell argue that their arbitration provision in their contracts is unconscionable. The FAA allows arbitration agreements to be declared unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This "saving clause permits agreements to arbitrate to be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability." *AT&T Mobility*, 563 U.S. at 339 (quotations omitted). In Indiana, "a contract may be declared unconscionable if a great disparity in bargaining power leads the party with lesser power to enter a contract unwillingly. In addition, the contract must be one that no sensible man not under delusion, duress or in distress would make, and one that no honest and fair person would accept." *Beaver v. Grand Prix Karting Ass'n*, 246 F.3d 905, 910 (7th Cir. 2001) (citing *Pinnacle Computer Servs., Inc. v. Ameritech Publ'g, Inc.*, 642 N.E.2d 1011, 1017 (Ind. Ct. App. 1994)) (quotations omitted).

Ms. Penninger and Ms. Bell argue that Optimal didn't give them the time or opportunity to read and understand the arbitration clause in their contracts. They also argue that Optimal didn't tell them that they were signing an arbitration agreement and affirmatively represented that what they were signing was merely an acknowledgement of their receipt of an employee handbook. In support, they say the title does not mention an "arbitration agreement," the signature line is on a separate page from the provision containing the arbitration agreement, and the form used too small a font. These points are recited generally in affidavits from both plaintiffs.

Indiana law presumes that a party has read and understood the documents she signs, and a person "cannot be released from the terms of a contract due to [her] failure to read it." *Clanton v. United States of America*, 686 N.E.2d 896, 899-901 (Ind. Ct. App. 1997); *see also Degroff v. Mascotech Forming Technologies-Fort Wayne*, 179 F. Supp.2d 896, 903 (N.D. Ind. 2001) (arbitration agreement valid when plaintiff claimed she did not review it because she effectively conceded review when she signed the employment application).

4

This presumption can be overcome by a showing of fraud or misrepresentation. *Fultz v. Cox*, 574 N.E.2d 956, 958-59 (Ind. Ct. App. 1991).

This record falls short of creating a factual question as to the arbitration clause's validity. Each contract, which is identical here, is just over one page. It plainly tells each employee that it is in fact a "contract." The font size throughout the contract is consistent. There are only five sections—one of which is denoted by its header plainly as an "<u>Arbitration Agreement</u>." Though each employee says she lacked the "time and opportunity" to read her contract, it would take only moments to read this short contract and to ask any questions about it, and they both admit that Optimal presented their contract for them to sign. They thus could have read it.

"Time and opportunity" self-serves merely as a conclusion without presenting facts that would allow a reasonable factfinder to conclude that they really had no time or that they really had no opportunity. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 596 (7th Cir. 2003) (mere self-serving affidavits without any factual support in the record are insufficient to create a triable issue of fact); *see, e.g., Ortiz v. Winona Mem. Hosp.*, 2003 U.S. Dist. LEXIS 12446, 24 (S.D. Ind. June 4, 2003) (rejecting argument that plaintiff had insufficient time to read a document containing an arbitration agreement when she "omitted information about the who, what, where, when and how concerning her lack of opportunity to read the forms."). For instance, they offer no facts to define the time they had (or lacked) or that they asked for more time and Optimal unreasonably refused; or facts to suggest that Optimal hid the terms, or prevented them from reading the contract, or forced them to sign while telling them not to read it, or forced them to sign immediately at threat of being asked to leave if they tried to read it, or anything of the sort.

Though Ms. Penninger and Ms. Bell assert in their affidavits that they were "told to sign the Contract to acknowledge that [they] received the employee handbook" with no mention of an arbitration agreement, even when drawing all reasonable inferences in their favor this does not create a genuine triable issue. First, this statement wasn't false because their contracts also served to acknowledge receipt

5

of the employment handbook. Second, even if the statement might be said to have been incomplete (because the contract covered other things too), a mere glance at the document and its headers would indicate to a reader that the contract covered more than the employee handbook. *See Plymale v. Upright*, 419 N.E.2d 756, 762 (Ind. Ct. App. 1981) (person must exercise common sense and judgment as a "practical limitation on the actionability of various representations," for she "simply cannot believe, or rely upon, everything [she] is told"); *see, e.g., Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 574 (7th Cir. 2001) (Illinois law) (party may not enter a transaction with eyes closed and avoid learning of fraud by not reading the contract). In short, nothing supports a reasonable inference that their reliance on this one statement by Optimal was reasonable. *See Ortiz*, 2003 U.S. Dist. LEXIS 12446 at 26-27.

The court appreciates that both Ms. Penninger and Ms. Bell wanted a job, and Optimal would offer them a job only if they signed the contract (with the arbitration agreement). But this isn't a record that reasonably reflects an unconscionable arbitration agreement. Whatever disparity in bargaining power existed, it existed solely because of a prospective employee-employer relationship. "Mere inequality in bargaining power, however, is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33 (1991). Individuals enter employment relationships under these circumstances all the time. That alone falls short of establishing that no sensible person would accept such a term except under delusion, duress, or distress. *See Beaver*, 246 F.3d at 910; *Abbott v. Lexford Apartment Servs., Inc.*, 2002 U.S. Dist. LEXIS 14746, 5 n.2 (S.D. Ind. Aug. 2, 2002) ("If we were to find that no low-level employee can be held to an arbitration agreement due to a supposed disparity in bargaining power between the employer and employee, then most arbitration agreements to resolve employment disputes would be rendered ineffective.").[1] The arbitration provision in their contracts isn't unconscionable.

---

[1] This case doesn't present the more unusual scenario where a party seeking to enforce a contract bears the burden of showing that the provisions were explained to the other party. *See Weaver v. American Oil Co.*, 276 N.E.2d 144, 148 (Ind. 1971) (party bears such a burden when attempting to enforce a contract provision that is "contrary to

B. *Cost-Sharing and Fee-Shifting Provisions.*

Per the contracts, "the cost for arbitration shall initially be split equally between [the employee] and the Company." Ms. Penninger and Ms. Bell argue that due to their unemployment and lack of income, they are financially unable to pay even a modest arbitration fee, so arbitration isn't a viable forum to vindicate their rights. They say in their affidavits they cannot afford the split. They provide a rough estimate of what their arbitration fees might be.

When a party seeks "to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 92 (2000). Ms. Penninger and Ms. Bell draw support from one case that invalidated an arbitration agreement that required the former employee to pay half the arbitrator's fees even to invoke the dispute resolution mechanism. *See Shankle v. B-G Maint. Mgmt. of Colorado, Inc.*, 163 F.3d 1230, 1234 (10th Cir. 1999). In this circuit, a party attempting to avoid arbitration must show "that the expenses that she necessarily and definitely would incur would make arbitration prohibitive"—not just how the party's financial situation will be factored into an assessment of the arbitration costs, but also how the costs will compare with litigating in court. *James v. McDonald's Corp.*, 417 F.3d 672, 679 (7th Cir. 2005). Unsupported statements are insufficient to sustain the party's burden. *Green Tree*, 531 U.S. at 91 n.6.

At the start, neither Ms. Penninger nor Ms. Bell explains her financial circumstances outside of saying she has been and remains unemployed. The court reviews requests all the time to forgo filing fees, but even in these circumstances someone must provide some information about their inability to pay.

---

public policy" and there existed a great disparity in bargaining power); *Clanton v. United States*, 686 N.E.2d 896, 899 (Ind. Ct. App. 1997) (party must show that the provisions were explained if the enforcing party possesses such superior bargaining power that the contract is signed under economic or other distress); *Geiger v. Ryan's Family Steak Houses, Inc.*, 134 F. Supp.2d 985, 999-1002 (S.D. Ind. 2001) (employer didn't properly explain an agreement that was in fact a three-party contract that bound the employee to use an arbitration company that the defendant contracted exclusively with).

7

The court appreciates that, in this arbitration context, this may not require a searching inquiry into an employee's assets and expenses, particularly when facing a potentially sizeable arbitration bill. *See Morrison v. Circuit City Stores*, 317 F.3d 646, 663-64 (6th Cir. 2003). But a plaintiff cannot merely say they cannot pay. *See Green Tree*, 531 U.S. at 91 n.6; *Baumann*, 421 F. Appx. at 635 (requiring "specific information"); *see also James*, 417 F.3d at 679.

After all, the American Arbitration Association has a fee hardship waiver to protect parties from prohibitive expenses (based, as a primary factor, on federal poverty guidelines). Without any details about their financial circumstances, Ms. Penninger and Ms. Bell haven't submitted "evidence indicating how [their] financial situation would be factored into an assessment of the arbitration costs under this hardship provision." *James*, 417 F.3d at 679. Indeed, even the AAA form would require greater disclosure to assess whether there might be a hardship or not.

Ms. Penninger and Ms. Bell raise a separate concern too—the shared cost of the arbitrator's private expenses (outside of the AAA's filing fee). The cost-sharing provision in this contract lacks the cap and allowance for reduction because of substantial need found in some other arbitration agreements. *See, e.g., Baumann*, 421 F. Appx. at 635. The AAA's normal rule requiring the company to pay the arbitrator's costs, *see* Am. Arb. Ass'n, *Employment/Workplace Fee Schedule: Costs of Arbitration* § 6 (Jan. 15, 2024), would not seemingly trump this contract, at least given how it is written, *see also Illinois Cas. Co. v. B&S of Fort Wayne Inc.*, 235 N.E.3d 827, 834 (2024). Thus they, through their experienced counsel, estimate that a typical employment case, assuming a reasonable arbitrator rate, might result in a fee of several thousand dollars to be split initially between them and Optimal. *See also Shankle*, 163 F.3d at 1234 n.5. Of course, to the extent that they proceed with their cases together, as they filed the case here, the split fee for them would prove less than half for each individual.

This still fails to show that they will "necessarily and definitely" incur such expense, must less that the cost in arbitration will so exceed the cost in court such as to effectively deny them legal recourse.

*James*, 417 F.3d at 679. For one, their case might resolve and avoid any such expense. For another, Ms. Penninger and Ms. Bell may prevail. If so, their contracts contain a fee-shifting provision: "the prevailing party in any dispute between the parties will be entitled to its costs and expenses, including attorney fees, court or arbitration costs and all other costs associated with such action." Putting a pin in their argument that this fee-shifting provision is unconscionable—a separate arbitrable question reserved for the arbitrator rather than the court, *see Wallrich v. Samsung Electronics America, Inc.*, 106 F.4th 609, 620 (7th Cir. 2024)—the provision presents an avenue for both individuals to avoid the expense of arbitration altogether. It cannot be said then that they necessarily and definitely will incur prohibitive arbitration expenses, or that there is a demonstrable difference in cost between arbitration and court litigation.

Suppose, just hypothetically, that Ms. Penninger and Ms. Bell fail in their claims. Perhaps they succeed in arguing that the fee-shifting provision is unenforceable, but suppose the worst-case scenario that they don't, and instead present a groundless case. Their expense will likely still prove less in arbitration than what they would incur in court. *See James*, 417 F.3d at 679. In theory, in the design of arbitration, and not infrequently in practice when it comes to employment disputes, the parties will resolve such claims in arbitration more swiftly than in court. Less time means lower attorney fees. And that would matter in such a loss because, even in court, both Ms. Penninger and Ms. Bell could face Optimal's claim for attorney fees under Title VII. 42 U.S.C. § 2000e-5(k); *CRST Van Expedited, Inc. v. EEOC*, 578 U.S. 419, 422-23, 432 (2016). Accounting for a reasonable arbitrator's expense, a loss in court for a groundless claim would likely be more costly than such a loss in arbitration.

Perhaps the calculus would be different for a non-frivolous loss, but Ms. Penninger and Ms. Bell never show one pathway to expense or resolution to be more likely than another. And these hypotheticals illustrate the point that, on this record, it proves too speculative to say arbitration would be cost prohibitive and too speculative to say proceeding with arbitration will likely be so different in cost that it

9

effectively denies them legal recourse or justifies invalidating their agreement to arbitrate.[2] *James*, 417 F.3d at 679; *Baumann*, 421 F. Appx. at 635. Indeed, if put to the task, they undoubtedly would say the most likely scenario is that they would prevail, in which case the fee-shifting provision in both their contracts would inure to their benefit and avoid the cost that worries them. Ms. Penninger and Ms. Bell have not shown "why arbitration would be too costly but litigation in the court[] would not be," *Baumann*, 421 F. Appx. at 635, or their "likelihood of incurring such costs," *Green Tree*, 531 U.S. at 81.

    C. *Shortened Statute of Limitations.*

Ms. Penninger and Ms. Bell argue that the contract contains an unenforceable statute of limitations: "any arbitration … arising out of a dispute that directly or indirectly relates to the Company Parties shall not be brought unless the same is commenced within 180 days following the incident giving rise to such dispute[.]"

"[A]n arbitration agreement may shorten the limitations period in discrimination and retaliation cases, so long as it is reasonable." *Baumann v. Finish Line*, 2009 U.S. Dist. LEXIS 76271, 11 (S.D. Ind. Aug. 26, 2009) (citing *Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1205-06 (7th Cir. 1992)); *see also Summers v. Auto-Owners Ins. Co.*, 719 N.E.2d 412, 414-15 (Ind. Ct. App. 1999) ("well-established in Indiana that, while not favored, . . . contractual limitations shortening the time to commence suit are valid, at least so long as a reasonable time is afforded."). Whether this 180-day limitations period might be enforceable, that would likely entail a deeper analysis than either side presents. *Cf. Taylor*, 966 F.2d at 1203-06 (applying Illinois law) (affirming a finding that a six-month limitation of actions clause in an employment contract for 42 U.S.C. § 1981 claim was reasonable). For today, Optimal represents that it is not attempting to enforce this provision, so the issue is moot because it has no bearing on the enforceability of the arbitration clause or the ability of these former employees to pursue their claims in arbitration.

---

[2] The court has not been presented with information about a contingency fee arrangement or its terms (if any exists here) to alter this analysis.

D. *Dismissal.*

The court will compel arbitration. Optimal requests that the case be dismissed. Because the FAA envisions the court's supervisory role, staying the case is generally preferred to facilitate ongoing judicial assistance in the arbitration process. *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024).

## CONCLUSION

Accordingly, the court GRANTS the motion to compel arbitration [14], DENIES the motion to dismiss [14], STAYS the case pending arbitration, and ORDERS the parties to file notice of the arbitration's completion within 14 days of any award or other final resolution so that the court may address any dismissal in timely fashion.

SO ORDERED.

November 15, 2024                                         *s/ Damon R. Leichty*
                                                          Judge, United States District Court